Edward F. Luskett v. RJEM, LLC, et al. Good morning, Your Honors. My name is Joseph Duffy. I'm here on behalf of RJEM, LLC. Okay. And, Appellant, do you want to reserve some time for rebuttal? I would take 10 minutes for the aboriginal argument and whatever time for the wiles for rebuttal. Okay. Okay. Let's proceed. May it please the Court. Counsel, this case involves the application of the equitable doctrine of equitable subrogation. It's a doctrine which allows, in certain cases, for one party to be substituted for the position of another in order to avoid injustice or unjust enrichment. Counsel, I have a question. Throughout this litigation and throughout the record, you provide different reasons why Mr. Paliatka paid off the debt. You indicated that it's to protect and preserve Paliatka's interest in the property, to prevent legal action by Renovo against Lyle, and to protect and preserve Lyle's financial interests. So why did Paliatka pay the debt? Well, Lyle had a number of loans with Renovo, including the loan that was made for this property. Lyle was under a lot of pressure from Renovo to pay off the balance of the loan. Lyle went to his grandmother, who Mr. Paliatka was married to at the time, and asked his grandmother for help. His grandmother went to Ed, and Ed agreed to make a loan to Lyle to pay off Renovo on all of its loans. Why was Lyle on the hook for all of this? Well, he was the owner of a company by the name of Skyline One, Inc., and also another company, which is not involved in this case, S-12 LLC, which were two borrowing entities from Renovo. Lyle personally guaranteed all of those loans, and all of them went into default, and Renovo was threatening legal action against Lyle, so he went to his grandfather for help. So was it Skyline, or was it Lyle who was the borrower? Skyline was the mortgagor on the mortgage. Skyline executed a note payable to Renovo. That note was personally guaranteed by Lyle. Now, facts in this case are relatively simple. In August of 2013, Skyline purchased the subject property at 5372 Otto Place, Oakland, Illinois. The property was obtained with the proceeds of a mortgage loan from Renovo Financial. That mortgage was subsequently recorded in October of 2013. In March of 2014, Renovo assigned that mortgage to RFLF1, LLC. Thereafter, in July of 2014, Skyline executed a quitclaim deed conveying legal title to the property to the defendant, RJEM, LLC. The quitclaim deed reflected a consideration of $160,000. Curiously, after the closing, the Renovo mortgage was not released. It remained outstanding. We never were able to take any discovery in the trial court, so the facts surrounding the execution of the quitclaim deed, the payment of the consideration, whether there was a contract between Skyline and RJEM, those facts have not been presented yet. I'm sorry to interrupt you. Yes, Your Honor. At the time that you prepared the deed in trust and had it executed, were you aware that the quitclaim deed existed? No. Now, I will acknowledge, Your Honor, that in a normal real estate transaction, it should have been closed through an escrow. And if it was closed through an escrow, the title company would have brought down the title. We would have seen this recorded deed and would have raised the issue at that time. Because of the pressure that was being imposed upon Lyle by Renovo Financial, my client made the loan to Lyle before we were able to obtain title commitments. When we did obtain the title commitment after we made the disbursement to Renovo, there were correspondence that were exchanged between myself and Mr. Duffy, who will be arguing in a minute, and we were unable to resolve the matter. Therefore, we filed this lawsuit against RJEM. You know, in order to determine equitable separation, you know, the courts have to look at a number of factors. One of them, you know, is going to be when the right to this equitable segregation was inserted. And second would be a motivation for that. I mean, the motivation seems to shift here all the time. The motivation in the first complaint is not the same as in the amended complaint and so on and so forth. Well, Your Honor, when we filed our original complaint, our theory in that complaint was that we were entitled to an equitable mortgage because we paid a debt that previously existed. That complaint was dismissed. We filed another amended complaint that was dismissed as well under 2615. In our second amended complaint, the theory was that we were entitled to subrogation to the prior Renovo loan. The subrogation argument is based upon the fact that the Renovo mortgage loan was a valid encumbrance, which existed at the time that RJEM acquired titles for the property. There cannot be a contest as to the validity of that mortgage. And we paid that mortgage. See, that's the point I'm trying to bring out. This is almost like a dart board. You're throwing darts to see what's going to stick. Your Honor, I've heard that criticism before and I accept it. That would, I suppose, be my fault because I was trying to frame the legal theory of the case based upon the facts. I knew what the just result was, in my opinion. But accomplishing that just result with the alleged improper cause of action became difficult because of the facts and circumstances surrounding the situation. I believe that the doctrine of subrogation is an appropriate doctrine. I believe that if all of the facts come out, we can establish our entitlement to subrogation. But I also believe that dismissing the case with prejudice on a 2619 motion before any discovery is taken and before I have an opportunity to find out what RJEM knew and why they agreed to take a quick claim deed to this property, which was subject to a Renovo mortgage, I think it was precipitous to render that decision. If I can interrupt you for a second. So following up on Justice Gordon's question, in the second amended complaint, you allege that Skyline had agreed that Pagliacca was segregated to RFLF, whatever it is, rights under the Renovo loan. Was there a written agreement to this? The loan was documented. There was a demand note that was executed by Lyle. That demand note had attached to it the legal descriptions of all the properties that were going to be transferred to Mr. Pagliacca to his land trust at Countryside Bank as consideration for the loan that he made. There was an exhibit to the demand note, which is part of the trial court record, which shows the legal descriptions of all the properties, including the subject property on auto. So there was a written agreement. Yes. Okay. So now I'm a little confused because didn't Skyline already convey their interest in the property prior to that? Yes. So how could they enter into an agreement? Because we didn't know that they had conveyed title to the property previously, and that wasn't disclosed to us by Lyle. Now, subsequently in November of 2015, Lyle, after he had been threatened with lawsuits from Renovo, went to his grandfather and asked his grandfather to make a loan to pay off Renovo, which ultimately happened. The wire transfer was sent on November 4 of 2015 to pay off all of the Renovo loans. Now, it was originally intended that Skyline and S-12 would execute deeds conveying title to Pagliacca's land trust. During the course of the negotiations, we learned that Renovo had actually recorded deeds in lieu of foreclosure, which Lyle had executed at some time previous to that. So we required that Renovo execute warranty deeds conveying title to the Countryside Bank Land Trust. That's how the title derived from Renovo to the Countryside Bank Land Trust in this case. It was not until after that deed was recorded that we learned that title had previously been conveyed to RJEM LLC. But the fact is that Pagliacca paid off the Renovo loan, but for Pagliacca's paying off the Renovo loan, RJEM would have been subject to that mortgage. There is no indication that as to how Lyle used whatever proceeds he received from the $160,000 that was allegedly paid by RJEM for this property, but we do know that it wasn't used to pay off Renovo. But for Pagliacca's paying off this mortgage loan, RJEM would have been subject to the mortgage. Now, Judge Gamrath, in her opinion, drew a number of conclusions, I think mainly based upon the fact that Pagliacca was Lyle's grandfather. She based her decision on the finding that Pagliacca was a volunteer, and under the doctrines of equitable subrogation, a mere volunteer or intermeddler is not entitled to subrogation. And I would respectfully submit that there is no evidence that Pagliacca acted as a volunteer. In fact, the evidence, I believe, is to the contrary. Pagliacca documented the loan with a demand note. He required that Lyle clause the properties, or Renovo clause the properties to be conveyed to his land trust as consideration for the loan. Excuse me, but in the second amended complaint, isn't it alleged that he was a volunteer? No, we allege that he was not a mere volunteer. He was not a mere volunteer. Right. We allege that he was not a mere volunteer, but Judge Gamrath made a finding that he was a volunteer, and I believe that her finding was based mainly upon the conclusion that he was a volunteer because it was Lyle's grandfather. And I'm not aware of any cases that held that a familial relationship is conclusive that a party making a loan to another would be deemed to be a volunteer. And for that reason, I believe that the trial court's decision dismissing the case with prejudice on the 2619A9 motion was inappropriate and should be reversed. Do you want to save some time for rebuttal? Yes, Your Honor. Thank you. Good morning, Your Honors. Good morning. May it please the Court. I would like to address one perhaps correction that counsel just made. Regarding Your Honor's question about the demand note, counsel did not attach any demand note to the complaint. He did not mention the demand note in the complaint. The demand note does not mention subrogation. The demand note does not. It refers to the property as a collateral property, or I'm sorry, a collateral assignment. It talks about assigning leases and rents, and that is all. Furthermore, on that point, at the time that document was signed by Lyle Anastos, Lyle Anastos had previously conveyed all interest in the property to our job. He had no right to make any promise regarding that property to his grandfather. What about counsel's argument that they were prevented from finding these facts out? The no discovery argument. Arjim, as part of its third motion to dismiss in this case, submitted an affidavit signed and sworn by Arjim's manager. Neither counsel in his response to Arjim's motion nor the plaintiff submitted any counter affidavit, nor did they submit any facts to counter that affidavit at all. Counsel seems to be implying that my client was not telling the truth in that affidavit. I have nothing to say about that. Arjim is the victim of fraud by plaintiff's grandson. Lyle Anastos defrauded Arjim and numerous others, not only in the matters noted today, but in many other acts of fraud. Anastos and his company Skyline fraudulently sold the premises to Arjim, failing to disclose the underlying mortgage. Anastos then apparently fraudulently convinced the plaintiff to loan him money to pay off this and several other mortgages, at least one of which was in a similar situation as Arjim, the Bush v. Pagliacca case, which I'll discuss later. When Anastos defaulted on that loan from his grandfather, the plaintiff sued him and received a final judgment for the full amount plus costs and attorney's fees. We are here today because plaintiff would rather collect that amount from Arjim than his own grandson. His grandson is the sole bad actor in this matter. He is responsible for the debt and the fraud that brings us here today. Equity does not permit the plaintiff's grandfather, I'm sorry, the plaintiff, from collecting from his grandson's fraud. The plaintiff alleged in his second amended complaint that he paid the balance of a commercial loan, which was executed by Skyline 1, Inc., to protect the financial interests of his grandson, referring to Lyle Anastos. In this matter, the circuit court reasonably found plaintiff had no right to equitable subrogation because plaintiff acted as a volunteer, and secondly, because the object of subrogation is to prevent injustice and to compel the payment of a debt by the one who is responsible for the debt. So are we to assume that he's a volunteer because he alleged it in the second amended complaint? Your Honor, there are two separate holdings, just to be clear. He was a volunteer. His allegation in the second amended complaint that he was not a volunteer is an erroneous legal conclusion that is not based on the facts before the court. Importantly, the... There wasn't an evidentiary hearing here, was there? Pardon me? No, there was not, Your Honor. So you're talking about basically what would happen at trial, but this is just a complaint and a motion to dismiss? So credibility determinations can't be made here? There's a sworn affidavit before the court that was not contradicted. The law requires that uncontradicted counter-affidavits, I'm sorry, uncontradicted affidavits be taken as facts. So you're basing our... If we're going to affirm this based on the affidavit? On the affidavit and plaintiff's complaint. The court reasonably found the plaintiff acted as a volunteer. Equitable subrogation is a principle where one who involuntarily pays the debt of another succeeds to the rights of the original creditor. In the Ohio National Life Insurance case, which was cited by a plaintiff in his appellate brief, the court held, and I quote, it is well settled that a mere stranger or volunteer cannot, by paying the debt of another, be subrogated to the creditor's rights. The court further held, quote,  And if he pays that debt, a mere volunteer. Plaintiff's complaint made clear. He paid the debt to the benefit of his grandson. At the time the plaintiff paid the debt, the plaintiff had no interest in the property. At the time the plaintiff paid the debt, Lyle Anastas had no interest in the property. At the time the plaintiff paid the debt, Skyline One had no interest in the property. So if Polyaka hadn't paid the debt, who would have been on line for it? Perhaps RJM, but that would be for RJM to settle its own matters in court. I mean, essentially what a plaintiff has done here is paid a stranger's mortgage to benefit someone else. Someone who's not even here today. Plaintiff made new arguments in his appellate brief. Plaintiff argued he made the payment to protect the interest of a land trust. That allegation was not made in the lower court, as I said previously. That is a novel argument that was not made. Additionally, in the reply brief, Plaintiff made an argument that the payment was made due to a threat of mob violence. Again, that is a novel argument that was not made previously. Additionally, that threat of mob violence apparently occurred over a year, or I'm sorry, nearly a year after this payment was made. We're absolutely confused about how a threat a year later made this payment, caused the plaintiff to make the payment. Even if the plaintiff's new argument, that he made the payment to protect the title interest of a land trust, that argument is flawed. The deed in trust was executed almost a month after the payment was made. Again, the plaintiff had no interest at the time of the payment. The deed in trust is invalid on its face because the grantor had no interest. Which to make a deed. It is a cloud on the title. By its terms, the deed in trust did not transfer any interest to the plaintiff personally. Plaintiff did not pay the debt involuntarily under any reasonable definition of the word. I want to make one thing clear. Plaintiff did not make this payment out of the goodness of his heart to protect his grandson. Plaintiff collateralized this payment with a loan to Anastos and Skyline and S12 LLC and Catherine Anastos, Lyle's wife. When Lyle defaulted on that loan, plaintiff sued him and recovered everything. Anastos and Skyline are the ones who benefited from this. Anastos and Skyline received the loan from Renovo. They received a payment from Argem, and they received a much larger loan from plaintiff. Secondly, the court found that Skyline was responsible for the debt and equity dictates that they pay the debt. And subrogation in this matter would harm an innocent party. The overwhelming theme throughout equitable subrogation cases is that subrogation is not appropriate when it would harm an innocent party. The court in Dick's Mutual Insurance Company, which plaintiff cited, held as follows. Quote, the right of subrogation is an equitable right and remedy, which rests on the principle that substantial justice should be obtained by placing ultimate responsibility for the loss upon the one whom in good conscience it ought to fall. Subrogation is allowed to prevent injustice and unjust enrichment, but will not be allowed when it would be inequitable to do so. The circuit court concluded to allow plaintiffs to enforce the Anastos-Skyline mortgage against Argem would result in and not ameliorate the injustice against Argem, and therefore equitable subrogation in this matter is not appropriate. What about their argument that Argem is the one that's actually getting the windfall here? Pardon? Argem, if the court affirms the decision by the lower court, Argem will receive exactly what it bargained for. It paid $160,000 for what it thought was a lien-free house. That was what Skyline's attorney told the State of Illinois and Argem. That is what Skyline told Argem. That is what has been testified to in an affidavit which was not countered by plaintiffs. Ultimate responsibility for this debt should be on Skyline and Lyle Anastos. Anastos and Skyline executed the mortgage. Anastos and Skyline fraudulently conveyed the property to Argem without disclosing the mortgage. Anastos and Skyline received multiple payments and loans. Anastos has clearly been unjustly enriched. He has defrauded Argem, and he has apparently received multiple loans and payments, not only for the premises today, but also for several others. To allow subrogation or an equitable lien would not be equitable or fair because it would further an injustice and fraud by the plaintiff's own grandson on Argem. If plaintiff is subrogated, an innocent party will be harmed. Plaintiffs should not be allowed to recover twice for such an injury. I would also like to discuss the Pagliacca v. Bush case. The case is an extraordinarily similar case involving an identical fact-check. The case was filed on the same day that this was filed. The case was filed by the same plaintiff's attorney. In both matters, the properties at issue were once owned by Anastos companies. In both matters, Anastos fraudulently conveyed those properties to others without disclosing underlying mortgages. In both matters, the plaintiff apparently paid off those mortgages. In both matters, the plaintiff collateralized his payment with a loan to Anastos. Was that part of your affidavits in this case? I do not think so, no, Your Honor. So how was it related to this case? Because, as the other Justice previously said, we believe the precedent is binding. We believe that the attorneys knew the law and that they continued with this case anyway, even though they knew they never had a chance because of the decision in the Pagliacca v. Bush case. But that case was also discussed in Judge Gamert's... It was, yes, sir. In Pagliacca v. Bush, the trial court dismissed the matter because plaintiff did not have a written subrogation agreement. The appellate court affirmed that decision. The appellate court also went further. The appellate court examined whether Pagliacca was entitled to an equitable lien because the Bushes were essentially unjustly enriched. The same argument the plaintiff has made here. The appellate court found that the Bushes did not own a debt, duty, or obligation to the plaintiff. Because, as with Argyem, Argyem had nothing to do with the execution of the deed. I'm sorry, of the mortgage, just like the Bushes. Just like the Bushes, Anastos is the one who benefited from all these loans and mortgages and payments. Just like the Bushes, Argyem received no special benefit when it agreed to purchase the property. Plaintiff's attempt to distinguish the Bush case relies on a fact that it's immaterial and inconsequential to whether he's entitled to equitable subrogation. Plaintiff relies on a fact that immediately before his case began, the property that, I'm sorry, the party that had purchased the property from Anastos had sold it to the Bushes. So there was a man in between. That makes no difference. The Bushes did not have any special information that Argyem had. Argyem had no special information that the Bushes had. To be clear, the cases began as mirror images filed on the same day. And was there a judgment in that case? Yes, Your Honor. And was there a recovery on the judgment? I'm sorry, the case was dismissed and it was appealed and the appeal was affirmed. In this court, I think last August. You've already gone past your time. May I have one minute to summarize? If the court affirms the circuit court's ruling, Argyem will receive substantially what it bargained for five years ago. That is the premises lien free in exchange for $160,000. Plaintiff collateralized this payment and declared it as a loan to his grandson and his grandson's company. Plaintiff did not make this payment to protect his own interests. Anastos and Skyline are the beneficiaries of plaintiff's payment. That was the stated goal of plaintiff's payment and it has come true. Plaintiff has a final judgment against that for the entirety of the loan. Plaintiff should not be permitted by this court to capitalize on his grandson's fraud against Argyem. We ask the court to affirm the trial court. Thank you. First, counsel, I think, indicated that I somehow implied that he wasn't telling the truth in his affidavit. I want to make it clear to this court that I cast no aspersions on Mr. Duffy whatsoever. Mr. Duffy has been shown the utmost integrity throughout the trial court proceeding and this proceeding, and I have no reason to doubt his credibility whatsoever. We are both representing parties who are victims of Lyle's fraudulent scheme, and I don't cast any aspersions upon Mr. Duffy or Argyem, and if Mr. Duffy derived that from my pleadings, I apologize to him in front of this court. Regarding the issue of subrogation, Argyem, yes, they were an innocent party, but so was Pollyatka. When Pollyatka made the loan to Lyle... But the big point here is that there's an affidavit that's unrebutted. Well, yes, but I don't believe that affidavit set forth facts that would be sufficient for the court to derive the conclusion that Pollyatka was a volunteer. That was the basis for the trial court's decision. The affidavit had nothing to do with Pollyatka. The affidavit set forth facts relevant to Argyem's payments to Lyle or to Skyline for the property, but it did not say anything about Pollyatka's motivation for paying off the affidavit submitted by Argyem that Pollyatka was a volunteer. That was an inference that the trial judge drew from the facts and circumstances that she had before her, and that simply, I believe, was the fact that Ed Pollyatka was Lyle's grandfather. Argyem has received a quitclaim deed from Skyline that was subject to any liens or encumbrances on the property. There's no evidence of any other agreement between Skyline and Argyem which would have promised that the property be delivered to Argyem free and clear of any liens. As I indicated previously, there was no discovery taken in the trial court, and therefore we could not determine whether or not there was such an agreement. So the quitclaim deed stated that they were going to take subject to any liens that may be possibly in existence? I don't believe it said anything about liens or encumbrances, but it was called a quitclaim deed, and it transferred all of the right title and interest of Skyline and into the property to Argyem. Regarding the Pollyatka v. Bush case, I argued that case. I was involved in it from the beginning. It is true that those two cases were filed on the same day. That was part of the whole scheme. Virtually the same type of scenario was involved in the original transaction. The original buyer from Skyline was a company by the name of Mearstar, and during the penancy of the litigation, Mearstar conveyed title to Bush, and the appellate court made a specific point of noting that Bushes were innocent purchasers. They obtained a loan to purchase the property from Mearstar. They were not involved in any of the underlying transactions, and that any of the fraudulent activities by Lyle could not be imputed to the Bushes. Furthermore, the appellate court stated in its opinion, our review is limited to whether Pollyatka completed sufficient facts to state a cause of action for an equitable mortgage or an equitable lien. That was the sole issue before the appellate court in the Pollyatka v. Bush case, which is different from the issue before this court, and that is equitable subrogation. Are there any other questions? Thank you very much for your time, Your Honor. You've given us an interesting case, and we'll take it under advisement.